Michael MBUGUA, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–07–00690–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 21, 2009.

Discretionary Review Refused
March 17, 2010.

659

Jani J. Maselli, Houston, TX, for Appellant.

Michael Mbugua, Kenedy, TX, pro se.

Bridget Holloway, Assistant District Attorney–Harris County, Dan McCrory, Assistant District Attorney, Houston, TX, for Appellee.

Panel consists of Justices BLAND, SHARP, and TAFT.*

## OPINION

TIM TAFT, Justice (Retired).

A jury convicted appellant, Michael Mbugua, of the offense of murder and assessed punishment at life in prison. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2003). We determine whether (1) the trial court abused its discretion in failing to suppress appellant's statement; (2) this appeal should be abated and the trial court required to submit findings of fact and

---

* Justice Tim Taft, who retired from the First Court of Appeals on May 31, 2009, continues to sit by assignment for the disposition of this case, which was submitted on March 24, 2009.

conclusions of law regarding the denial of appellant's motion to suppress; (3) the trial court erred in not submitting a jury instruction pursuant to article 38.23 of the Texas Code of Criminal Procedure;[1] and (4) the exclusion of portions of appellant's medical records from evidence was reversible error. We affirm.

## Facts

Kimberly Watkins and Blair Brown were driving westbound on West Bellfort in Houston, Texas, on the night of May 13, 2006, when they saw the complainant lying facedown in the road. They stopped at an Auto Zone store parking lot, and Watkins exited the car to help the complainant. When Watson approached him, she saw that he was covered in blood. She bent down to check on him and touched his neck. He was breathing and making a humming sound, but was not moving or speaking and did not respond to her. Watson stood up and waved her arms to deter cars from accidentally hitting him, turning around occasionally to check on the complainant. Brown was trying to call 9-1-1; she had borrowed a cell phone from a Pizza Hut delivery driver in the same parking lot, but the phone was not working properly. Within a minute or so, Watson saw a young man come across the street and approach the complainant, and she asked him if the complainant "was okay." He did not answer her and, when she turned, she saw him stabbing the complainant with a knife—first in the back about five times, and then lifting the complainant's head and slitting his throat twice. Brown also saw the attack. The man then stepped back calmly, dropped the knife, and slowly walked away. Ac-cording to Brown and Watson, the complainant did not have a weapon. After the assault, other cars stopped, and Brown was able to borrow another person's cell phone and place a call to 9-1-1.

After the ambulance arrived, Watson noticed a vehicle across the street in someone's front lawn, as if an accident had occurred. The vehicle was on the opposite side of the street from the Auto Zone and on the same side of the street from whence the assailant had come.

The complainant, later identified as Bruce Caldwell Jr., died from his injuries. Brown and Watson were able to give a description of the assailant to the police, but neither was able to identify him from a police photographic spread.

Houston Police Department Sergeant Mark Newcomb investigated the murder scene and noticed that a car had driven up onto a nearby lawn, hitting some landscaping in the yard. The keys were still in the car, the passenger side door was open, and there was blood in the car and a trail of blood leading from the car to the spot on the street where the complainant was attacked. Two knives were recovered from the scene, and another was later found in the car.[2] A piece of human finger was later recovered from the driver's seat of the vehicle.

Newcomb determined that the wrecked vehicle was registered to appellant and went to appellant's home around 2:30 a.m. on the same night of the incident, but did not find him. The next day, Newcomb spoke to appellant by telephone. At that time, appellant was at his parents' home, being treated by emergency medical technicians for an injury to his hand. Appel-

---

**1.** TEX.CODE CRIM. PROC. ANN. art. 38.23 (Vernon 2005).

**2.** The blood found on the blade from one knife contained the complainant's blood and the other contained a mixture of appellant's and the complainant's blood.

lant agreed to make a statement and was transported by the police to the Homicide Division, where appellant gave a videotaped oral statement regarding the incident.

In his statement, appellant explained that he and the complainant had been traveling to Wal–Mart in appellant's car, which appellant was driving. He and the complainant were talking about business, but appellant felt that, "between the lines," the complainant was talking about how he was going to kill appellant.

Appellant said that he and the complainant had been partners in the music business,[3] but the complainant had broken the partnership by trying to kill him. According to appellant, the complainant had felt it necessary to put a price on appellant's head, had "a lot of people ... coming to [appellant's] house trying to kill" appellant, and had told appellant that he was going to kill him, his mother was going to kill him, his father, a police officer,[4] was going to kill him, and other people were going to kill him. The complainant had threatened appellant periodically over the previous few weeks. Appellant carried two knives in his car for personal protection. Appellant never reported these threats to the police.

The night of the incident, appellant and the complainant "got into an altercation" and appellant "had to pull out [his] knife." He did not know if the complainant had a weapon; he did not see one. Appellant stabbed the complainant twice in the arm or shoulder. During the scuffle, the complainant cut appellant, injuring him. The complainant grabbed the steering wheel, he turned the car into the yard, and they hit a curb. The complainant then jumped out of the car and ran. Appellant followed the complainant into the median to find out what was wrong with him, to see if he was all right, and to help him; he made it within a few feet of the complainant, but ran when he heard someone rack a shotgun. He kept running because he was afraid that someone was trying to kill him and he walked all night, finally arriving at his parents' house. He expressed surprise in learning from the interviewing officer that the complainant was dead, said, "Damn," repeatedly, and asked, "So, what am I looking at?" When the officer asked appellant why he stabbed the complainant in the median, he answered, "I don't even remember," and when the officer asked appellant if he did not remember stabbing the complainant after leaving the car, appellant answered, "Damn."

After the interview, Newcomb went down to the second floor of the same building, signed a formal complaint charging appellant with murder, and then, once the complaint went to the clerk's office, arrested appellant, who was booked in and charged with murder.

Appellant filed a motion to suppress the oral statement, which was denied after a hearing. The videotaped oral statement was played to the jury at appellant's trial, over appellant's objection.[5] At trial, appel-

---

**3.** Appellant and the complainant were neighbors, had been "best friends" since 1995, and had been involved in the rap music business together since 2005.

**4.** The complainant's father was an officer with the Sugar Land Police Department.

**5.** The State also called Brown, Watson, and Newcomb at trial, along with three other offi-

cers who were relevant to the taking of the oral statement; a forensic pathologist, who discussed the autopsy of the complainant; two friends and business associates of the complainant, who discussed the relationship between appellant and the complainant; a police officer assigned to the crime scene unit, who described the scene of the incident and sponsored evidence from the scene; a latent print examiner, who stated that she was

lant asserted a claim of self-defense and called two witnesses. The first was his mother, who testified about appellant's fear that the complainant was going to kill him, his arrival at home in the early hours on the morning after the incident, and police actions on the night of the incident and the following morning, as they searched for appellant at his home and ultimately took him to the police station to make a statement. His second witness was Dr. Vincent Di Maio, a forensic pathologist, who testified that the complainant was likely killed by the wound to the heart, not the wounds to the neck, and that appellant's wounds were consistent with being defensive wounds.[6] Appellant did not testify.

### Denial of Appellant's Motion to Suppress

In his first issue, appellant contends that the trial court erred by denying his motion to suppress his statements because appellant was in custody and "had clearly invoked his right to an attorney, in violation of state law and the Constitution." In his third issue, appellant contends that the trial court erred in failing to suppress his statement "because he was in custody at the time it was given and he was not given his *Miranda*[7] warnings in violation of state law and Constitution."

## A. The Motion to Suppress

Appellant filed a motion to suppress any statements made by him,[8] asserting that:

(1) any conversations between himself and law enforcement officials occurred when he was under arrest or substantially deprived of his freedom by law enforcement officials;

(2) any statements made were involuntary, coerced, and enticed;

(3) he was deprived of his right to counsel and did not make an intelligent and knowing waiver of that right;

(4) his statements were tainted by an illegal and unlawful detention in violation of his constitutional rights under "the Fifth and Fourteenth Amendments of the Constitution to the United States, Article 1, Section 9 of the Texas Constitution, and Article 38.23 of the Texas Code of Criminal Procedure";

(5) his statements "were taken without the safeguards required by and in

---

unable to find sufficient fingerprints to make an identification; a district attorney investigator, who had taken a buccal swab from appellant and delivered it to the crime lab; and an analyst from the crime lab, who testified regarding blood found on various items at the scene that was consistent with the genetic profile of the complainant, appellant, or a mixture of both.

**6.** The State called two witnesses in rebuttal—a friend of the complainant and a neighbor—who both offered opinion and reputation testimony regarding whether the complainant was a peaceful and law-abiding person. Appellant then called his mother in rebuttal to give opinion and reputation testimony regarding whether he was a peaceful and law-abiding person.

**7.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In Texas, peace officers give the warnings required by Texas Code of Criminal Procedure article 38.22, not *Miranda* warnings. *See* TEX.CODE CRIM. PROC. ANN. art. 38.22, § 2 (Vernon 2005) (setting out required warnings).

**8.** Appellant filed two motions to suppress, one entitled, "Motion to Suppress Statements," and one entitled, "Motion to Suppress." At the commencement of the hearing, appellant's counsel clarified that he was seeking to suppress only any statements by appellant and the only signed order regarding a suppression motion in the record is the order denying the "Motion to Suppress Statements." We therefore consider only the "Motion to Suppress Statements."

violation of Article 38.22 of the Code of Criminal Procedure"; and

(6) the admission of his statements "is a violation of [appellant's] rights pursuant to the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States, Constitution, Article I, Section[s] 9 and 10 of the Texas Constitution and Articles 1.05 and 38.23 of the Texas Code of Criminal Procedure."

The trial court held a hearing on the motion, at which the State called four witnesses—Darryl Smith, Hilario Galvan, Anthony Wayne Duncan, and Newcomb. Appellant called his father, Joe Mbugua. The court also had before it the videotape of the interview, a transcript of the same, and several photographs that had been admitted into evidence.

At the conclusion of the evidence, the State argued that the requirements of article 38.22 did not apply because appellant had not been under arrest until after he made his initial admissions, at which point the officer gave appellant his article 38.22 warnings. The defense argued that appellant was in custody the entire time and invoked his right to an attorney or, alternatively, that appellant was initially not in custody, but was in custody when he arrived at the police station.

After further arguments about custody and the invocation of the right to counsel, the court stated to appellant's counsel, "I think succinctly you're arguing he was in custody at the time he's making statements about the lawyer, and, therefore, it constitutes an invocation of his right. The State's position is he was not in custody at the time that he made the statements about the lawyer, so the Court doesn't need to reach the question as to whether it was an invocation or not at that point." The defense responded, "Right," as did the State. Appellant concluded by saying that

the final portion of his argument was that appellant invoked his right to counsel, but that the police improperly kept asking questions after such invocation, instead of stopping the interrogation.

The trial court then denied the motion to suppress, making the following statements:

The Court finds that [appellant] ... was not in custody at the time that he was taken in to the Homicide department, was not in custody at the beginning of the conversation—the questioning that occurred at the beginning of the videotape. And I also find, just so the record is clear, that his question about ... could he wait for his lawyer did not constitute an invocation of right to counsel. So, furthermore, the Court therefore finds that the requirements of Article 38.22 of the Code of Criminal Procedure, at the time they were given, [appellant], that he understood those rights—that he voluntarily gave those rights up and voluntarily gave the statement. And I think my—my statement that, "Can I wait until my lawyer gets here," not being an invocation of right to counsel applies as well to the statement made by [appellant] when he is making the same inquiry on page 14 [of the transcript] when he is being given his legal warnings. All right. The statement will be admitted.

## B. Invocation of Right to Counsel

Under the Fifth Amendment of the United States Constitution, an accused has the right to have an attorney present during custodial interrogation. *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981) (noting that that right was first declared in *Miranda* decision). Once an accused has invoked that right, police interrogation must stop until counsel has been made available or the accused himself initiates a dialogue

with the police. *Id.* at 484–85, 101 S.Ct. at 1884–85; *State v. Gobert,* 275 S.W.3d 888, 892 (Tex.Crim.App.2009).

However, a person in custody must unambiguously and unequivocally invoke his right to counsel before interrogation must cease. *Davis v. United States,* 512 U.S. 452, 458–61, 114 S.Ct. 2350, 2355–56, 129 L.Ed.2d 362 (1994). Not every mention of a lawyer will invoke the right to the presence of counsel during questioning. *Gobert,* 275 S.W.3d at 888; *Dinkins v. State,* 894 S.W.2d 330, 351 (Tex.Crim.App.1995). An ambiguous or equivocal statement regarding counsel does not require officers to halt the interrogation or even to seek clarification. *Davis,* 512 U.S. at 461–62, 114 S.Ct. at 2356; *Gobert,* 275 S.W.3d at 892.

Whether the particular mention of an attorney constitutes a clear invocation of the right to counsel depends on the statement itself and the totality of the surrounding circumstances. *Gobert,* 275 S.W.3d at 892. The test is an objective one: "whether a reasonable police officer, under similar circumstances, would have understood the statement to be a request for an attorney or merely one that *might* be invoking the right to counsel." *Reed v. State,* 227 S.W.3d 111, 116 (Tex.App.-Houston [1st Dist.] 2007, pet. ref'd) (citing *Dinkins,* 894 S.W.2d at 351). "The suspect 'must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer would understand the statement to be a request for an attorney.'" *Gobert,* 275 S.W.3d at 893 (quoting *Davis,* 512 U.S. at 459, 114 S.Ct. at 2350).

■ The statement that appellant asserts on appeal was an invocation of his right to counsel[9] occurred at the beginning of the interview in the following exchange with Newcomb, after Newcomb had confirmed that appellant did not need immediate medical care, had had an opportunity to use the bathroom and have a drink of water, understood that he was not under arrest, and wanted to speak with the police:

[Newcomb]: Okay. So you are not under arrest. We just want to get your side of the story on what happened, okay?

[Appellant]: Okay.

[Newcomb]: And so, do you—you want to continue to talk to us and speak with us; is that correct?

[Appellant]: *Can I wait until my lawyer gets here?*

[Newcomb]: Okay. If—if you want to talk to a lawyer, we'll have to cut off the interview right now. We can't ask you anything else. We can't speak to you anymore, and you will not have an opportunity to give your side of the story.

[Appellant]: Then what's going to happen?

[Newcomb]: I'm sorry?

[Appellant]: What's going to happen?

[Newcomb]: Well, from that point I'll have to go make some phone calls, and I'll get back with you. But if you are refusing to speak with us and you want an attorney, if that's what you're saying, then we're going to get up, we're going to walk out of this room and that's what—the end of the conversation. Now you are not under arrest at this time. So you don't have to have an attorney if you are not under arrest, okay? So—

[Appellant]: Can I call my parents so I can [*sic*] I feel more comfortable talk-

**9.** There was a later, similar question that the trial court also ruled was not an invocation of the right to counsel, but appellant makes no complaint on appeal regarding the second question, and we therefore do not review it.

ing to my parents here because they know—they know the story too.

Appellant argues that the question, "Can I wait until my lawyer gets here," was an unequivocal and unambiguous request for counsel, during a custodial interrogation. He contends that, therefore, the police should have ceased questioning him at that point and that the additional questioning was an improper attempt to coerce a statement from him.

The State argues that appellant did not clearly invoke his right to counsel and, even if he had, appellant was not in custody at the time and therefore the police were not required to cease questioning. The State also argues that, although not required to, the police followed the ambiguous statement with questions seeking to clarify whether appellant wanted an attorney, and appellant did not state that he wanted counsel, but instead confirmed that he wanted to keep talking to police.

We hold that the statement at issue was not a clear and unambiguous invocation of the right to counsel. An accused "must unambiguously request counsel" and "a statement either is such an assertion of the right to counsel or it is not." *Davis,* 512 U.S. at 459, 114 S.Ct. at 2355. If the statement does not meet the required level of clarity, then officers are not required to stop questioning. *Id.*

Appellant has referred us to the Court of Criminal Appeal's decision in *Gobert.* In *Gobert,* after the police had read Gobert his article 38.22 rights and asked if he understood them, Gobert replied that he did, and then stated, "I don't want to give up any right, though, if I don't got no

lawyer." *Gobert,* 275 S.W.3d at 889–90. The Court of Criminal Appeals held that Gobert's use of the term "any right" referred to the article 38.22 rights just read to him, which included the right to counsel, and that the entire statement expressed Gobert's clear desire not to waive any rights in the absence of counsel. *Id.* at 893. The Court held that such statement was a limited invocation of the right to counsel, "clearly stating" a "firm and unqualified condition" that, before any further attempts to persuade Gobert to waive any other rights, the officers must first afford him the right to have his attorney present during that attempt. *Id.* at 894. The Court held that the officers had violated Gobert's right to counsel when they failed to abide by this "unambiguous and unqualified condition." *Id.*

By contrast, appellant's question, "Can I wait until my lawyer gets here?" did not clearly state a firm, unambiguous, and unqualified condition that any further questioning must be conducted only with his attorney present. Appellant's question, both by the language used and in the context of the totality of the circumstances, was not a clear and unambiguous assertion of the right to counsel and an exercise of that right, but was more in the nature of an inquiry about the interview process and appellant's options in regard to that process. Newcomb understood the question as such and responded accordingly, explaining what would happen in the process if appellant wished to "wait" and to talk to his lawyer. Appellant's question was, at best, an ambiguous articulation of a desire for counsel.[10] *See Davis,* 512 U.S.

---

10. Appellant has also referred us to *Silva v. Estelle,* 672 F.2d 457 (5th Cir.1982) and *United States v. Lee,* 413 F.3d 622 (7th Cir.2005). As we noted in *Reed v. State,* 227 S.W.3d 111, 116 (Tex.App.-Houston [1st Dist.] 2007, pet. ref'd), we are not bound by such authority.

However, more significantly, the question in the case before us is far more ambiguous than those in *Silva* (in which the appellant told a magistrate that he wanted a lawyer and wanted to use the telephone to call a lawyer) and

at 462, 114 S.Ct. at 2357 (holding that statement, "Maybe I should talk to a lawyer" was not request for counsel); *Gutierrez v. State*, 150 S.W.3d 827, 832 (Tex. App.-Houston [14th Dist.] 2004, no pet.) (deciding that question, "Can I have [my attorney] present now?" was ambiguous question about counsel); *Halbrook v. State*, 31 S.W.3d 301, 302 (Tex.App.-Fort Worth 2000, pet. ref'd) (determining that statement, "Do I get an opportunity to have my attorney present?" did not constitute clear and unambiguous invocation of counsel); *Flores v. State*, 30 S.W.3d 29, 34 (Tex.App.-San Antonio 2000, pet. ref'd) (holding that question, "Will you allow me to speak to my attorney before?" was not clear and unequivocal invocation of right to counsel).

Having concluded that appellant's question did not clearly and unambiguously invoke the right to counsel, we hold that trial court did not abuse its discretion in not granting appellant's motion to suppress on this basis. We overrule appellant's first issue.[11]

## C. Failure to Give *Miranda* Warnings

■ The State contends that appellant failed to preserve his contention under his third issue, regarding the failure of the police to give appellant his *Miranda* warnings, because appellant did not specifically direct the trial court's attention to the failure to give article 38.22 warnings as a basis for suppression in either his motion to suppress or at the motion-to-suppress hearing, but instead only pursued his claim as a violation of his invocation of counsel

while in custody. The State argues that, at the conclusion of the motion-to-suppress hearing, appellant asked the trial court to decide only whether he was in custody and had invoked his right to counsel, in effect abandoning any other grounds for suppression listed in the motion.

We first note that the videotape and the transcript of the interview indicate that appellant received the required Code of Criminal Procedure article 38.22 warnings after he had made some initial inculpatory admissions and prior to more detailed questioning. The only issues then, regarding the provision of any required warnings are whether the police were required to give appellant such warnings at an earlier time than was actually done; if so, when that should have been done; and if there were any incriminating statements made after that time that should have been suppressed.

Appellant did not bring such a contention to the attention of the court, either in his motion to suppress or during the oral hearing, nor did he ask the court to decide these questions and issue a ruling thereon. His motion failed to preserve his contention on appeal because it did not alert the trial court that he wished the issue to be decided; rather, the motion stated that the rights encompassed in these warnings were violated and that his oral statements were taken "without safeguards." These general statements in the motion would not have alerted the trial court to the specific complaint that his article 38.22 warnings should have been provided at an earlier point in the interview, and they do

---

*Lee* (in which the appellant asked directly, "Can I have a lawyer?").

**11.** The last sentence of appellant's first issue reads, "The statement by [appellant] should have been suppressed as a violation of his Fifth Amendment right to remain silent." Because there is no discussion, citation to

authorities, or legal analysis regarding this statement, we read this to be a conclusion to appellant's arguments regarding an invocation of his right to counsel, rather than a separate argument regarding his Fifth Amendment right to remain silent.

not comport with the issue on appeal. *See* Tex.R.App. P. 33.1(a)(1) (requiring, in order to preserve error, sufficient specificity to make trial court aware of complaint and ruling by court on complaint); *Broxton v. State,* 909 S.W.2d 912, 918 (Tex.Crim.App. 1995) (holding that issue on appeal must comport with complaint made at trial). Appellant likewise did not bring the issue of the delay in the article 38.22 warnings to the trial court's attention at the motion-to-suppress hearing or at trial. Appellant's sole focus and argument to the trial court at the motion-to-suppress hearing was that he was in custody, had invoked his right to counsel, and was improperly questioned after having done so. When the videotaped oral statement was offered into evidence at trial, defense counsel asked to approach the bench. The court asked if appellant "had any additional objections other than the ones already made," and counsel responded, "No, I just wanted to make sure it was clear that I wasn't waiving any of my previous objections." Because appellant did not object to the admission of his statement based on the failure of the police to provide required warnings at an earlier time, either at the suppression hearing or at the time of trial, and did not secure a ruling on such a complaint, he did not preserve error as to this issue. *See* Tex.R.App. P. 33.1(a)(1); *Swain v. State,* 181 S.W.3d 359, 365 (Tex. Crim.App.2005) (concluding that, when appellant failed to object to admission of statement at motion-to-suppress hearing on ground for suppression raised on appeal, but instead, argued a different basis for suppression, issue was not preserved); *Johnson v. State,* 263 S.W.3d 287, 290 (Tex.App.-Houston [1st Dist.] 2007, pet. dism'd) (same).

We hold that this contention was not preserved and decline to address it. We overrule appellant's third issue.

## Abatement for the Preparation of Findings of Fact and Conclusions of Law

■ In his second issue, appellant asserts that the trial court erred in not submitting written findings of fact and conclusions of law regarding its ruling on his motion to suppress.

As detailed previously, the trial court made a statement of its findings and conclusions at the close of the motion-to-suppress hearing. Following these remarks, appellant's counsel commented to the court, "I think it has to be on the record that we have—we are entitled to do specific findings of fact and conclusions of law. So I just want to get that on the record." The court responded, "Well, I think you're certainly entitled to those. And I think that will be an interesting issue for you if it gets that far." Appellant's counsel replied, "Correct. Thanks, Judge. That's all I have." No proposed findings of fact or conclusions of law appear in the record, nor is there any formal written order containing findings of fact or conclusions of law.

Appellant asserts on appeal that the trial court was required to enter written findings of fact and conclusions of law pursuant to Texas Code of Criminal Procedure article 38.22, section 6. *See* Tex.Code Crim. Proc. art. 38.22, § 6 (Vernon 2005). Appellant requests that we abate this appeal and order the trial court to issue such findings. *See Urias v. State,* 155 S.W.3d 141, 142 (Tex.Crim.App.2004) (holding that when trial court fails to make findings of fact and conclusions of law required by article 38.22, section 6, proper procedure is for reviewing court to direct trial court to comply with this provision). The State asserts that, because appellant did not argue that his statement was involuntary during the suppression hearing, the trial

court was not required to make findings under article 38.22, section 6. *See Jones v. State,* 859 S.W.2d 537, 540–41 (Tex.App.-Houston [1st Dist.] 1993, pet. ref'd) (holding that trial court was not required to make finding under section 6 of article 38.22 when appellant did not make objection as to voluntariness of statement).

Section 6 of article 38.22 provides, in relevant part:

> In all cases where a question is raised as to the voluntariness of a statement of an accused, the court must . . . . [i]f the statement has been found to have been voluntarily made and held admissible as a matter of law and fact by the court . . . enter an order stating its conclusion as to whether or not the statement was voluntarily made, along with the specific facts upon which the conclusion was based, which order shall be filed among the papers of the cause.

TEX.CODE CRIM. PROC. ANN. art. 38.22, § 6.

■ A trial court satisfies this requirement of article 38.22, section 6 when it dictates its findings of fact and conclusions of law to the court reporter and they are subsequently transcribed and made part of the appellate record. *Murphy v. State,* 112 S.W.3d 592, 601 (Tex.Crim.App.2003); *Vasquez v. State,* 179 S.W.3d 646, 654 (Tex. App.-Austin 2005), *aff'd,* 225 S.W.3d 541 (Tex.Crim.App.2007). This the trial court did. On appeal, appellant does not challenge the sufficiency of the trial court's oral statements to serve as the required conclusions and findings; he complains only that the trial court did not enter written findings. We conclude that the trial court's dictation of its findings of fact and conclusions of law to the court reporter, which are now part of the appellate record, satisfied the requirement of article 38.22, section 6. *See Murphy,* 112 S.W.3d at 601.

We overrule appellant's second issue.

### Jury Instruction

In his fourth issue, appellant contends that the trial court erred in failing to give an instruction to the jury, pursuant to article 38.23(a) of the Texas Code of Criminal Procedure,[12] that would have required the jury to determine whether appellant was in custody at the time that he gave his statement.

At trial, appellant specifically requested the trial court to include "a 38.23 charge involving the factual issue of whether or not [appellant] was in custody at the time that he arrived at the Houston Police Department for his statement . . . . [a]nd if he was in custody and did not receive *Miranda* [warnings], that the jury be instructed to disregard the statement in its entirety." He also tendered a proposed charge. The State responded that there was no dispute as to any factual issue. The trial court then explained that custody was a term of art, a mixed question of law and fact, and did not "boil[ ] down to a fact determination turning on a particular fact," discussed the evidence regarding custody, found that it did not raise an issue with respect to whether appellant was in

---

12. TEX.CODE CRIM. PROC. ANN. art. 38.23(a) (Vernon 2005). This section provides:

> No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

> In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence obtained. *Id.*

custody, and denied the proposed instruction and any instruction under article 38.23.

On appeal, appellant acknowledges that he was entitled to an instruction under article 38.23(a) "only if the trial evidence raised a factual issue concerning whether the evidence was obtained in violation of the federal constitution or the Texas Constitution or any of its laws," quoting *Bell v. State*, 938 S.W.2d 35, 48 (Tex.Crim.App. 1996). He asserts that the testimony of his mother, that she told the paramedics that she wanted to take appellant to the emergency room and that the police told her that she could not do that, raised a factual issue as to whether appellant was actually "in custody," entitling him to an instruction under article 38.23(a).

■ An accused's right to the submission of an instruction under article 38.23(a) "is limited to disputed issues of fact that are material to his claim of a constitutional or statutory violation that would render evidence inadmissible." *Madden v. State*, 242 S.W.3d 504, 509–10 (Tex.Crim.App. 2007).

■ Before an accused is entitled to the submission of a jury instruction under article 38.23(a), he must meet three requirements:

(1) The evidence heard by the jury must raise an issue of fact;

(2) The evidence on that fact must be affirmatively contested; and

(3) That contested factual issue must be material to the lawfulness of the challenged conduct in obtaining the evidence.

*Id.* at 510.

■ "The first requirement for obtaining a jury instruction under Article 38.23, is that the defendant request an instruction on a specific historical fact or facts. The jury decides facts: the judge decides the application of the law to those facts." *Id.* at 511. There must be a genuine dispute about a material issue of fact before an article 38.23 instruction is warranted; if there is no disputed fact issue, the legality of the conduct is determined by the trial court alone, as a question of law. *Id.* at 510. In order for there to be a conflict in the evidence that raises a disputed fact issue, there must be some affirmative evidence in the record that puts the existence of that fact in question. *Id.* at 513. Furthermore, if other facts, not in dispute, are sufficient to support the lawfulness of the challenged conduct, then the disputed fact issue is not material to the ultimate admissibility of the evidence and is not to be submitted to the jury. *Id.* The disputed issue must be essential to deciding the lawfulness of the challenged conduct. *Id.* at 511.

■ There was no error in the jury charge from the absence of any article 38.23(a) instruction regarding custody because there was no conflict in the evidence raising a disputed fact material to the question of custody that would have mandated an article 38.23(a) instruction. Appellant's mother's statements to the paramedics and the police officer's response were not in dispute at trial. The State did not introduce any affirmative evidence at trial contradicting this testimony, and the possibility that the jury may or may not believe a witness does not create a factual dispute warranting an article 38.23(a) instruction. *Madden v. State*, 242 S.W.3d 504, 514 n. 26 (Tex.Crim.App.2007). Moreover, the proposed instruction did not charge the jury with resolving a specific issue of historical fact, but asked it to determine whether appellant was "in custody." A jury may not be instructed under article 38.23(a) to determine whether a person is "in custody" because such an instruction requires the jury to resolve an

issue of law, not of fact. *See Thompson,* 516 U.S. at 111–12, 113 n. 13, 116 S.Ct. at 465, 465 n. 13 (holding that "in custody" determinations presented mixed question of law and fact; also stating that "[j]udges alone make 'in custody' assessments for *Miranda* purposes."); *accord Madden,* 242 S.W.3d at 510–11, 513 (involving proposed article 38.23 instruction regarding "probable cause").

We hold that there was no error in the trial court's not providing an article 38.23(a) instruction to the jury. We overrule appellant's fourth issue.

### Redacting of Medical Records

█ In his fifth issue, appellant contends that the trial court erred in redacting portions of his medical records for the treatment of his hand that referenced his statements that the injuries had been sustained in a fight.

At trial, appellant called Dr. Vincent Di Maio, a forensic pathologist, to testify about the wounds sustained by the complainant and those sustained by appellant. Di Maio opined that the complainant died from the wound to the heart, not the wounds to the neck. He also testified that if appellant's medical records indicated that he suffered incised wounds or the cutting off of a tip of a finger, those injuries would be consistent with defensive injuries. Appellant attempted to introduce his medical records, and the State objected to the hearsay in the document, including the comment, "cut while fighting approximately 12 hours ago." Appellant responded that the comment fell under a hearsay exception for medical diagnosis or treatment. The court admitted the document, conditioned on the court's later ruling on the issue. Di Maio then reviewed the records and testified that his opinion was that appellant's wounds were consistent with being defensive wounds.

At a later time, outside of the presence of the jury, the trial court granted the State's request to redact two phrases in the medical records, "while fighting" and "following an altercation," explaining that they were not necessary for medical treatment and diagnosis. Appellant responded that he objected to the redaction on the ground that the State had waived its objection to the statements' being admitted by its cross-examination of Di Maio. The court overruled the objection.

We review a trial court's decision to admit or to exclude evidence for an abuse of discretion. *Shuffield v. State,* 189 S.W.3d 782, 793 (Tex.Crim.App.2006). If the ruling is within the bounds of reasonable disagreement, it should not be disturbed on appeal. *Id.* The mere fact that a trial court may decide a matter within his discretionary authority differently from an appellate judge in a similar circumstance might does not demonstrate an abuse of discretion. *Montgomery v. State,* 810 S.W.2d 372, 380 (Tex.Crim.App.1990). Rather, an abuse of discretion is shown when the trial court's ruling is "arbitrary or unreasonable," made "without reference to any guiding rules or principles." *Id.*

Texas Rule of Evidence 803(4) provides that the following statements are admissible as an exception to the hearsay exclusionary rule:

> Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pains, or sensations, or the inception or general character or the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

Tex.R. Evid. 803(4).

█ In order for statements to be admitted under rule 803(4), the proponent of the evidence must show that (1) the declar-

ant was aware that the statements were made for the purposes of medical diagnosis or treatment and that proper diagnosis or treatment depended on the veracity of the statement and (2) the particular statement offered is also "pertinent to treatment," that is, it was reasonable for the health care provider to rely on the particular information in treating the declarant. *Taylor v. State,* 268 S.W.3d 571, 589, 591 (Tex.Crim.App.2008).

The trial court excluded the evidence in this case based on the second factor. Appellant argues on appeal that "knowing how an injury occurred assists in treatment." However, he has not explicated why it was important for his treatment that the medical professionals know that he was cut *in a fight,* and he presented no evidence or argument at trial establishing that such information was important to his treatment. *See id.* at 591 (holding that it was appropriate to require proponent of hearsay exception to make record reflect that statement in question was important to efficacy of treatment). While the fact that appellant was cut was clearly pertinent to his treatment, the fact that he was injured "while fighting" and "following an altercation" was not. *See Fleming v. State,* 819 S.W.2d 237, 247 (Tex.App.-Austin 1991, pet. ref'd) (noting that "a patient's statement that he was struck by an automobile would qualify" under the rule 803(4) hearsay exception, but "his statement that the car was driven through a red light" did not). The trial court acted within the scope of its discretion in finding that appellant did not establish that the

statements "while fighting" and "following an altercation" were pertinent to his treatment and that therefore appellant failed to establish that the statements fell within the medical records hearsay exception. We hold that the trial court did not abuse its discretion in redacting these statements from the medical records admitted into evidence.

We overrule appellant's fifth issue.

### Conclusion

We affirm the judgment of the trial court.

Justice SHARP, concurring.

JIM SHARP, Justice, concurring.

I am compelled to concur in the decision of the Court and write separately to express my concern over the conduct of the police, trial counsel, and the State in this case.

Appellant was clearly in custody at the time that he first made incriminating statements, and I would expressly so hold. Telling a person repeatedly that he is "not under arrest" will neither cloak all sins nor absolve police from failing to provide a person required warnings[1] before interrogation when that person is, in fact, in custody. Behavior may speak as loudly as words, and when police behavior would cause a reasonable person to feel that he or she was not at liberty to terminate the interrogation and leave, then that person is in custody, no matter how many times an officer may declare otherwise.[2] *See*

---

1. *See* TEX.CODE CRIM. PROC. ANN. art. 38.22, § 2 (Vernon 2005).

2. A person is in "custody" during an interrogation if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest. *See Dowthitt v. State,* 931 S.W.2d 244, 254 (Tex.Crim.App.

1996). In other words, given these circumstances surrounding the interrogation, would a reasonable person have felt that he or she was not at liberty to terminate the interrogation and to leave? *See Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995).

*Dowthitt v. State,* 931 S.W.2d 244, 254 (Tex.Crim.App.1996); *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995).

In this case, the detective's refusal to allow appellant to use the telephone at the time that appellant requested it and the detective's statements to appellant that officers would "not allow" him to "to make a phone call right now," that officers were "going to just have you talk to us right here," and that appellant could make a phone call "after you talk to us" would have led a reasonable person to believe that his freedom of movement had been significantly restricted, *Dowthitt,* 931 S.W.2d at 255, and a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and to leave.[3] *Thompson,* 516 U.S. at 112, 116 S.Ct. at 465.

At that point, appellant was in custody. The police were, therefore, required to provide him with the proper warnings and to receive from him a knowing, intelligent, and voluntary waiver of his rights before questioning him.[4] They did not. They proceeded with a custodial interrogation and did not bother to warn him or to seek a waiver of his rights until *after* appellant had already given incriminating statements as the result of that custodial interrogation.

The police officers' failure to timely provide appellant his required warnings is compounded (indeed, fatally) by trial counsel's failure to preserve this complaint for appellate review, which precludes us from reviewing what seems to me to be the improper admission at trial of statements made as a result of custodial interrogation without proper warnings and without a proper waiver of rights. Trial counsel must be vigilant to properly assert, present, and argue all grounds at trial that are appropriate to suppress a client's statement that was taken in violation of constitutional or statutory rights. While appellant would undoubtedly have been convicted even without the admission of his statement (the often recited phrase by prosecutors to describe sure-win cases—"like shooting fish in a barrel"— has rarely been more appropriate), he may well not have had his own words used against him if the rights that are granted to all under our laws had been properly championed by the person who had the particular duty to do so.

Lastly, the State need not have introduced this statement to secure appellant's conviction. Appellant was witnessed by at least two people in the commission of this offense. Appellant's wrecked vehicle was at the scene, complete with a clear trail from that vehicle to the decedent. And, although forensic scientists at the Houston Police Department did not trace appellant's fingerprints to the knives found on site, there was little need to—fingerprints

---

3. The State refers us to *Lewis v. State,* 737 S.W.2d 857, 862 (Tex.App.-Houston [1st Dist.] 1987, pet. ref'd). However, the section to which the State directs us in *Lewis* is one in which the State was arguing that *access* to the telephone during the day was indicative of a *lack of coercion. Id.* It does not support an argument that the deprivation of access to a telephone is not indicative of custody. Indeed, deprivation of the use of a telephone is one indicator of police coercion. *See Haynes v. Washington,* 373 U.S. 503, 509–10, 83 S.Ct. 1336, 1341, 10 L.Ed.2d 513 (1963); *Arm-*strong v. State, 718 S.W.2d 686, 693 (Tex. Crim.App.1985), *overruled on other grounds, Mosley v. State,* 983 S.W.2d 249 (Tex.Crim. App.1998).

4. *See* Tex.Code Crim Proc. Ann. art. 38.22, § 3(2) (Vernon 2005) (prohibiting admission of oral statement of accused as result of custodial interrogation unless, prior to statement, required warnings were given and accused knowingly, intelligently, and voluntarily waived rights).

should be a mere footnote in a case file when a piece of the *appellant's actual finger* was left behind! Thus, the use of appellant's constitutionally suspect statement against him was not only violative of his rights, but wholly unnecessary to secure justice.